IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICHAEL A. ALLEN, JR., and<br>SHEILA JONES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10-CV-359 |
| | ) | |
| GEORGE GILLENWATER, JEREMY<br>JONES, D.E. YOUNG, DETECTIVE<br>TUNSTALL, WILLIAM KELLY,<br>G.A. HARRIS, and ROBERT VOORHEES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Plaintiff Michael Allen filed suit against officers of the Rockingham Police Department after he was arrested for a crime he did not commit. (Doc. 1.) His claims of false arrest and defamation arise out of an incident where a woman was abducted in a Walmart parking lot and he was identified as the suspect.[1] Plaintiff Sheila Jones, Mr. Allen's mother, also filed suit against officers of the Rockingham Police Department for entering her residence without a warrant in order to arrest her son for the kidnapping. (Doc. 53.) The Plaintiffs and the Defendants have filed cross-motions for summary judgment. (Doc. 82[2] and Doc. 86.)

---

[1] The complaint, (Doc. 1), does not specifically identify these, or indeed any, causes of action or allege facts specific to any Defendant. To the extent that the complaint could be read to assert other claims under 28 U.S.C. § 1983, Mr. Allen has not clearly identified the constitutional right he claims was violated, nor has he offered evidence to support those general claims.

[2] Doc. 82 is captioned by the Plaintiffs as "Motion for Request for Admissions" but this document was later ordered treated as a Motion for Summary Judgment. (Doc. 97.)

# I. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (internal citations omitted). The non-moving party then must show that there is a genuine issue of material fact and present more than a mere scintilla of evidence supporting the non-moving party's case. *Shaw v. Shroud*, 13 F.3d 791, 798 (4th Cir. 1994).

# II. BACKGROUND

The relevant facts are largely, but not entirely, undisputed. The following are the undisputed facts. Disputed facts will be identified later as they become relevant. The Court has not considered unsworn factual statements made in the pro se briefs filed by the Plaintiffs, as those are inadmissible for summary judgment purposes. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

On November 5, 2009, the Rockingham, North Carolina, Police Department received a call reporting an abduction of a woman from a Walmart parking lot. The report indicated that a black man, approximately 25 years old, approached the victim, entered her car, told her to drive, and threatened to kill her. (Doc. 87 at ¶ 3, 4.) The victim complied but later jumped from the moving vehicle and escaped. (*Id.* at ¶ 3.) After the victim escaped from the car, it was abandoned by the kidnapper. (*Id.*) Reports indicate that two black men were near the vehicle as it was abandoned. (*Id.* at ¶ 5.) Police searched the vehicle and sent items found inside the car for DNA testing. (*Id.*)

On November 6, Defendants Detective Jeremy Jones and Detective George Gillenwater went to the Walmart to review the surveillance tape and interview witnesses. (*Id.* at ¶ 6.) The surveillance tape showed a man following and then approaching the victim near her car in the parking lot. (*Id.*) After a short conversation, the man and the victim got into the car and drove away with the victim driving. (*Id.*) While the video did not provide a clear picture of the man's face, he appeared to be a black male with a slim build, about 5'10" in height, wearing a black hat and distinctive jewelry. (*Id.* at ¶ 6-7.)

From the surveillance tape, the detectives were able to retrace the suspect's movements before the kidnapping. (*Id.* at ¶ 8.) Inside Walmart, he interacted with two individuals: Wal-mart employee Desmond Wallace and McDonald's employee Shaung Flowers. (*Id.* at ¶ 8-10.) The detectives questioned Mr. Wallace and Mr. Flowers. (*Id.* at ¶ 10.) Mr. Flowers said he did not know the suspect, but would recognize him if he saw him again. (*Id.* at ¶ 11.) Mr. Wallace viewed the surveillance video and identified the suspect as Michael Allen. (*Id.* at ¶ 12; Doc. 86-2 at 13:17-25, 14:1-3.) Mr. Wallace identified Mr. Allen a second time by pointing him out in a high school yearbook. (Doc. 87 at ¶ 13.) Mr. Wallace reported that he and Mr. Allen attended high school together, played sports together, and had known each other for "some time." (*Id.* at ¶ 12.)

Based on the information on the surveillance tapes and Mr. Wallace's positive identification, Detective Gillenwater sought an arrest warrant for Mr. Allen from a magistrate. (*Id.* at ¶ 16.) The magistrate issued an arrest warrant for Mr. Allen on charges of first degree kidnapping and larceny of a motor vehicle. (*Id.*)

Officer Gillenwater learned that Mr. Allen had just been released from prison, and that before going to prison he had lived with his mother, Sheila Jones, in an apartment in the Timber Ridge apartment complex at 515 Steele Street. (*Id.* at ¶ 17.) A search of the Department of

3

Motor Vehicles records resulted in a valid Department of Motor Vehicles identification card for Mr. Allen listing 515 Steele Street as his address. (*Id.*)

Detectives Gillenwater and Jones and other officers went to Sheila Jones's apartment. (*Id.* at ¶ 18.) When the officers arrived, they formed a perimeter around the building. (*Id.*) Detective Gillenwater and Officer Tunstall knocked on Ms. Jones's door. (*Id.*) No one answered. (*Id.*) The officers decided to enter the apartment. (*Id.* at ¶ 19.) They obtained a key from an employee of the apartment complex and entered the residence. (*Id.*) No one was home. (*Id.* at ¶ 20.)

At some point that evening, the Defendant Chief of Police Robert Voorhees decided to "go public with the arrest and ask the public, via Crimestoppers, to be on the lookout for the suspect." (*Id.* at ¶ 21.) It is not clear from the record the exact time Mr. Allen's name was made public, but November 7 and November 11 local newspaper articles quoted Chief Voorhees, identifying Mr. Allen as the kidnapper. (Doc. 100-1.)

In the evening hours of November 6, but apparently before the public release of Mr. Allen's identity, officers went to the home of the victim with a photo lineup. (Doc. 87 at ¶ 23.) She had just been released from the hospital after being treated for a dislocated knee, broken ribs and other bones, and bruises. (Doc. 86-2 at 16:8-13.) At the officers' request, the victim's husband showed her eight photographs, including one of Mr. Allen. (*Id.* at 17:7-15; Doc. 87 at ¶ 23.) After taking some time to look at the pictures, and with some hesitation, the victim identified Cedric Bell. (Doc. 86-2 at 17:4-5; Doc. 87 at ¶ 26.) The detectives thought that the victim's identification was unreliable because she had just been released from the hospital and was on medication and because of the tentative nature of her identification. (Doc. 87 at ¶ 23-27.)

Later that same evening, officers with the Richmond County Sheriff's Department arrested Mr. Allen at his grandparents' home. (*See, e.g.*, Doc. 101.) Shortly after Mr. Allen's

arrest, Mr. Wallace and Mr. Flowers came to the police department for a line-up, and each identified Mr. Allen as the man in the Walmart wearing the black hat and distinctive jewelry. (Doc. 87 at ¶ 30.)

On January 21, 2010, the Police Department received DNA test results obtained from the items in the victim's car, which matched Cedric Bell, not Mr. Allen. (*Id.* at ¶ 32.) Soon thereafter, the charges against Mr. Allen were dismissed. (*Id.* at ¶ 33.)

## III. DISCUSSION

### A. ALLEN'S FALSE ARREST CLAIM

Mr. Allen brings a false arrest claim under 42 U.S.C. § 1983, alleging that Detective Gillenwater violated his Fourth Amendment rights by seeking an arrest warrant against him for the kidnapping charge without probable cause. In order for Mr. Allen to prevail on his claim for false arrest, he must prove that he was arrested without probable cause. *See Brown v. Gilmore*, 278 F.3d 362, 367-368 (4th Cir. 2002). Detective Gillenwater contends that probable cause existed to arrest Mr. Allen, and regardless, that he is entitled to qualified immunity because a reasonable officer could have believed that probable cause existed.

Probable cause is determined from "the totality of the circumstances" available to the authorities at the time of arrest. *Id.* at 367; *see also United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988). There are two factors that determine whether probable cause exists: 1) "the suspect's conduct as known to the officer," and 2) "the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). In other words, probable cause might be "lacking in a given case" and a suspect's constitutional "rights violated . . . because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id.* Probable cause "must be measured by the facts of the particular case." *Wong Sun v. United States*, 371 U.S. 471, 479 (1959).

Here, Detectives Gillenwater and Jones reviewed videotape of the suspected kidnapper at the Walmart. The suspect was wearing distinctive clothing and jewelry, and the detectives were able to track his movements in the store. They interviewed two employees at the store, and one confidently identified Mr. Allen as the suspect. The magistrate who issued the arrest warrant for Mr. Allen found this to constitute probable cause, and the Court agrees.

Mr. Allen contends that probable cause ceased to exist when the victim identified Cedric Bell as the kidnapper. Other courts have held that probable cause "may be dissipated if the investigating officer later learns additional information that decreases the likelihood" that the defendant committed a crime, *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005), and that while police may rely on the totality of the circumstances to establish probable cause, they cannot "disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).

These cases do not help Mr. Allen. First, the victim's identification of Mr. Bell was not strong and occurred while she was under the influence of medication. Moreover, her identification occurred in the evening hours on November 6, and there is nothing to indicate that Detective Gillenwater had time to seek a recall of the Order of Arrest before Mr. Allen was arrested that same evening by other officers relying on the warrant. Even if the failure to investigate Mr. Bell that evening before the other officers arrested Mr. Allen can be characterized as a failure to pursue a potentially exculpatory lead, that is not sufficient to negate probable cause. *See Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000). Given Mr. Wallace's positive and credible identification of Mr. Allen and the fact that the investigation had disclosed that two men were seen in the victim's car before it was abandoned in Rockingham, (Doc. 87 at

6

2; Doc. 88 at ¶ 8), the victim's tentative identification of another person did not dissipate probable cause.[3]

Even if probable cause did not exist to arrest Mr. Allen, the officers are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity determination consists of two questions: (1) whether the facts shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Durham v. Horner*, ___ F.3d ___, 2012 WL 3194462, at *4 (4th Cir. Aug. 8, 2012). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 231.

Whether a right is "clearly established" turns on whether "it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted." *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002) (internal quotation marks omitted); *see also Pearson*, 555 U.S. at 231 (holding that the doctrine of qualified immunity protects officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). A right is clearly established if it is sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted).

---

[3] Mr. Allen also points out various other evidence he claims is exculpatory. However, there is no indication that Detective Gillenwater was aware of this exculpatory evidence when he sought the arrest warrant.

7

Thus, qualified immunity is designed to protect officers from claims when they make reasonable mistakes "as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223.

Mr. Allen cites no case holding or even indicating that a conflict in witness statements dissipates probable cause. The law does not require a "case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Here, as noted above, the case law supports the Defendants. *See Torchinsky v. Siwinski*, 942 F.2d 257, 260-61 (4th Cir. 1990) (explaining the purpose of qualified immunity). Moreover, the officers secured an arrest warrant, and "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2011); *accord Porterfield v. Lott*, 156 F.3d 563, 570 (4th Cir. 1998) ("The Supreme Court has held that when a police officer acts pursuant to a warrant, he is entitled to qualified immunity if he could have reasonably believed that there was probable cause to support the application.")

Therefore, Detective Gillenwater is entitled to qualified immunity on Mr. Allen's false arrest claim. To the extent that the complaint alleges that other Defendants falsely arrested Mr. Allen, no evidence has been proffered to support any such claim.

## B. MR. ALLEN'S DEFAMATION CLAIM

Mr. Allen also alleges that Defendants Voorhees and Kelly defamed him by publicly and falsely identifying him as a kidnapper. When a person speaks false and defamatory words which "tend to prejudice another in his reputation, office, trade, business, or means of livelihood," a claim for slander exists. *Morrow v. Kings Dep't Stores, Inc.*, 57 N.C. App. 13, 20, 290 S.E.2d 732, 736 (1982). When the words amount to an "accusation that the plaintiff committed a crime

8

involving moral turpitude," the defendant commits slander per se. *Phillips v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 117 N.C. App. 274, 277, 450 S.E.2d 753, 756 (1994).

Chief Voorhees and Major Kelly admit they spoke to the press about Mr. Allen but deny that any defamatory statements were made. (Doc. 91 at 19.) They further contend that each had a qualified privilege to speak about the pending charges and that there is no evidence of malice.

In one newspaper article, Major Kelly is quoted as saying, "[w]here he was going, I couldn't tell you . . . . [b]ut we're glad she made it out when she did." (Doc. 100-1 at 3; *see also* Doc. 86-4 at 5-6.) This statement was not tied to Mr. Allen and cannot in any way be considered defamatory. There is no evidence of any other statements by Major Kelly. Thus, Major Kelly is entitled to summary judgment.

In another newspaper article, Chief Voorhees is quoted as saying that Mr. Allen "threatened the woman and told her to get in the car and drive." (Doc. 100-1 at 1.) "[K]idnapping [is] beyond any rational argument to the contrary, [a] crime[] involving moral turpitude." *Averitt v. Rozier*, 119 N.C. App. 216, 218, 458 S.E.2d 26, 28-29 (1995). Thus, this statement, if made and if false, is *per se* defamatory.

The Court will assume without deciding that Mr. Allen's proffer of a newspaper article is sufficient proof that the defamatory statement was made.[4] Even so, a defamatory statement may not be the basis for recovery if it was spoken by one with a qualified privilege.

> A defamatory statement is qualifiedly privileged when made (1) in good faith, (2) on subject matter (a) in which the declarant has an interest or (b) in reference to which the declarant has a right or duty, (3) to a person having a corresponding interest, right, or duty, (4) on a privileged occasion, and (5) in a manner and under circumstances fairly warranted by the occasion and duty, right or interest.

---

[4] Chief Voorhees did not remember exactly what he may have said to the media, (Doc. 86-7 at 12-17), and there is no evidence of the content of any such statement beyond a photocopy of the article.

*Shillington v. K-Mart Corp.*, 102 N.C. App. 187, 194-95, 402 S.E.2d 155, 159 (1991). If the occasion is privileged, there is a "presumption that the Defendant acted in good faith." *Id.* A qualified privilege applies here because "[n]ot only is communicating information about fugitives to the public reasonable, it is precisely the type of communication the law both encourages and protects." *Day v. Milam*, No. 1-11-cv-97, 2011 U.S. Dist. LEXIS 125334, at *24 (E.D.Va. Oct. 28, 2011).

Since Chief Voorhees has established the privilege, Mr. Allen must now show that the statement "was made with actual malice." *Averitt*, 119 N.C. App. at 219, 458 S.E.2d at 29. Malice can be shown by proving that a defendant made the statement "with knowledge that it was false, with reckless disregard for the truth or with a high degree of awareness of its probable falsity." *Shillington*, 102 N.C. App. at 195, 402 S.E.2d at 159. In the absence of malice, the "qualified privilege becomes an absolute privilege, and there can be no recovery even though the statement was false." *Averitt*, 119 N.C. App. at 219, 458 S.E.2d at 29. Mr. Allen has presented no evidence of malice on the part of Chief Voorhees.

In the absence of a showing of malice, Chief Voorhees is entitled to absolute immunity on the defamation claim and the defamation claim against him should be dismissed. To the extent that Mr. Allen has asserted a defamation claim against other Defendants, no evidence has been proffered of any defamatory statements by another other Defendant, and those claims should be dismissed.

## C. MS. JONES'S FOURTH AMENDMENT CLAIM

Ms. Jones claims that Detectives Gillenwater and Jones along with Officers Young, Tunstall, and Harris violated her Fourth Amendment rights when they entered her home without a search warrant in an effort to locate and arrest her son. The Defendants contend they acted properly because they had a warrant for Mr. Allen's arrest and reason to believe he lived in Ms.

Jones's apartment.  In the alternative, the Defendants contend that there were exigent circumstances justifying their entry.  The Defendants further assert the defense of qualified immunity.

### 1.  Fourth Amendment Violation

The Fourth Amendment guarantees "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  The core of the Fourth Amendment is the right "to retreat into [one's] home and there be free from unreasonable government intrusion."  *Silverman v. United States*, 365 U.S. 505, 511 (1961).  It is beyond dispute that "searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).

Nonetheless, under certain circumstances, an arrest warrant alone is sufficient to gain entry into a person's home to effect his arrest.

> If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.  Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Id.* at 602-603.  However, an arrest warrant does not authorize law enforcement to enter the home of a third person to execute it, even if the defendant is present, absent consent or exigent circumstances.  *Steagald v. United States*, 451 U.S. 204, 212-214 (1981).

The Defendants' evidence is that only Detective Gillenwater and Officer Tunstall entered the apartment.  (Doc. 87 at ¶ 20.)  Ms. Jones has proffered no evidence that any other officer entered her apartment.

11

### a. Exigent Circumstances

Detective Gillenwater and Officer Tunstall contend that they had exigent circumstances to enter Ms. Jones's home. Detectives Gillenwater and Jones testified that they became concerned for their safety after porch blinds suddenly began to move inside Ms. Jones's apartment. Mr. Allen had previously been convicted of robbery with a dangerous weapon, (Doc. 88 at ¶ 2), and was accused of recently committing a violent crime. They further note that Mr. Allen had family in surrounding apartments who might aid in an attempted escape.

"It is a hallmark of Fourth Amendment jurisprudence that the possibility of a threat to the safety of law enforcement officers may constitute exigent circumstances." *United States v. Legg*, 18 F.3d 240, 244 (4th Cir. 1994). Officers "need only possess a reasonable suspicion that such circumstances exist" in order to successfully assert the exigent circumstances doctrine. *Figg*, 312 F.3d at 639 (internal quotation marks omitted). While the court should review the circumstances surrounding entry, it should not engage in "unreasonable second-guessing of the officers' assessment of the circumstances they faced." *Id.* (internal quotation marks omitted). The court must look at the events and the officer's knowledge immediately before entry and apply an objective standard. *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009); *United States v. Moses*, 540 F.3d 263, 269-70 (4th Cir. 2008).

First, there is a dispute as to whether Detective Jones was actually able to see the moving blind as he reported; Ms. Jones has proffered evidence that the blinds are not visible from where Detective Jones stood. (Docs. 101 at 4 and 102 at 2.) This is a disputed question of fact. Second, even if Detective Jones could have seen the blinds, their movement is not evidence that Mr. Allen was within the home. Moving blinds may not be indicative of any human activity at all; it can be caused by the heating system or a draft or a pet, to list only a few of the

12

possibilities. Moreover, moving blinds give officers no indication that Mr. Allen was within, rather than Ms. Jones or any other person. Generalized suspicions do not establish probable cause or a reasonable belief. Finally, while the officers believed that the moving blinds indicated Mr. Allen's presence, their subjective beliefs are not relevant. *See Whren v. United States*, 517 U.S. 806, 813-814 (1996); *United States v. Hill*, 649 F.3d 258, 264 n.1 (4th Cir. 2011).

The Defendants also fail to identify any specific evidence of threats to their safety or of the possibility of escape. The officers may well have been wise to plan for these possibilities, as violence and escape are potential risks any time an accused is taken into custody. However, potential risks are not enough to justify entry into a third person's home, especially when the possibility of violence and escape were completely speculative. No one had seen Mr. Allen in the apartment, much less seen him with a weapon, and the kidnapping he was accused of committing did not involve a weapon. The police did not hear any threats, gunshots, or any other noise indicative of violence coming from the apartment. No one was at risk of immediate harm. There is no evidence the officers believed that Mr. Allen had tried to escape arrest in the past or to indicate he was attempting to escape or flee on that day. The undisputed evidence is that after the officers decided to enter, they waited to obtain a key from the landlord, (Doc. 88 at ¶ 27), further indicating no emergency situation existed.

"Generic" dangers and concerns "raised at the most general level" do not establish exigent circumstances. *Bellotte v. Edwards*, 629 F.3d 415, 424 n.2 (4th Cir. 2011). Where "neither the prospect of injury nor any other emergency gave the officers a plausible reason to neglect what the Constitution ordinarily demands," *id.* at 423, entry into a home based on "speculation" is not reasonable under the Fourth Amendment. *Id.* at 421; *United States v. Radka*, 904 F.2d 357, 362 (6th Cir. 1990) (noting that "mere possibility" is not enough to establish exigent circumstances).

13

Indeed, to justify an entry into Ms. Jones's home on these facts would vitiate the well-established rule that an arrest warrant alone does not justify entry into a third party's home.  *See generally Steagald*, 451 U.S. 204.  Under the Defendants' view, any time a suspect is accused of a violent felony or has a prior conviction for a violent offense, law enforcement can enter a third party's residence to arrest the suspect.  They have cited no case for this proposition, and it is not the law.  *See Welsh v. Wisconsin*, 466 U.S. 740, 745 (1984) (indicating that gravity of the offense is "an important part of [the] constitutional analysis" but that other "identifiable exigencies" are required); *United States v. Collazo*, 732 F.2d 1200, 1204 (4th Cir. 1984) (finding no exigent circumstances where the government entered a third person's home looking for a suspect in a large drug case where the government could have obtained search warrant); *Rich v. United States*, 158 F. Supp. 2d 619, 627 (D. Md. 2001) (finding no exigent circumstances for entry into a third party's home where the officers had an arrest warrant for the suspect accused of armed robberies); *United States v. Hill*, No. 2:04-CR-30, 2005 U.S. Dist. LEXIS 2263 (N.D.W. Va. Feb. 14, 2005) (recommended ruling of Magistrate Judge describing the "significant potential for abuse" of allowing search of a third party home for the subject of an arrest warrant).  Thus, even viewing the evidence in the light most favorable to the Defendants, the entry into Ms. Jones's home cannot be justified based on exigent circumstances.

### b.  Entry to Serve the Arrest Warrant

In the alternative, the Defendants contend that they had a reasonable belief that Mr. Allen lived in the residence and a reasonable belief that he was home.  *See Payton*, 445 U.S. at 602-03; *Hill*, 649 F.3d at 262.  As noted above, the officers were aware that Mr. Allen's DMV-issued identification card listed Ms. Jones's address and that police department records reflected that in the past Mr. Allen had lived with Ms. Jones.  (Doc. 87 at ¶ 17.)  Detective Gillenwater further

testified that before going to Ms. Jones's home, he spoke with Mr. Allen's probation officer, an Officer Almond, who stated that Mr. Allen lived with his mother. (*Id.*; Doc. 89-2 at 25.)

Ms. Jones has proffered evidence from several witnesses that Mr. Allen did not live with her and, in fact, had been forbidden by the apartment manager from living with her (Doc. 104-1; Doc. 103 at 2); that Mr. Allen was living with his grandparents (Doc. 101 at 1); and that Mr. Allen had a 6 p.m. curfew as part of his probation, and his probation officers came by his grandparents' home nightly to check on him. (*Id.*; Doc 102 at 2.)[5] There is no evidence before the Court from the probation officer, but a Department of Corrections printout in the police file printed on November 6 at 1:42 p.m. shows Mr. Allen as on probation/post-release and living at "515 Steel [sic] Street," which is Ms. Jones's address. (Doc. 89-2 at 24.)

If Mr. Allen was being supervised at his grandparents' home, it is difficult to think of a reason a probation officer would have given false information to a law enforcement officer concerning a suspect's address; the Plaintiff's evidence does perhaps gives rise to a credibility issue concerning Detective Gillenwater's testimony that a probation officer confirmed Mr. Allen was residing with his mother. On the other hand, the Defendants had substantial other evidence that Mr. Allen was living with his mother and there is no evidence that they had any information to the contrary. "[A]ctual knowledge of the suspect's true residence" is not required because it "would effectively make *Payton* a dead letter." *Valdez v. McPheters*, 172 F.3d 1220, 1225 (10th Cir. 1999). Thus, the undisputed evidence shows that the officers had a reasonable belief Mr. Allen lived at Ms. Jones's residence on Steele Street, meeting the first element of the *Payton* test.

---

[5] Ms. Jones also proffered documentary evidence to support her contention that the address on file with the probation department was that of Mr. Allen's grandparents. (*See* Doc. 100-7.) That document, which she identifies as Mr. Allen's "home plan," appears to be a printout of a Department of Corrections record, but it has not been authenticated, nor has she proffered evidence that any Defendant was aware of this information. Her unsworn statement in a brief, (Doc. 94-1), that she, her son, and the probation officer made Allen's home plan for him to live with her parents, is not evidence. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993).

*Payton* further requires that when officers seek to execute an arrest warrant in a home, the officers must also have "reason to believe the suspect is within." 445 U.S. at 603. Generally speaking, entry into a home to serve an arrest warrant on a resident is appropriate "only where multiple facts support a reason to believe that the subject of the arrest warrant is present at the time of entry." *Hill,* 649 F.3d at 264. Unresponsive noises inside a residence are, for example, insufficient to give rise to a reasonable belief that a particular resident is inside. *Id.*

Applying the rules of *Payton* and *Hill* together, officers here did not have reason to believe Mr. Allen was inside Ms. Jones's residence. No witness reported to law enforcement that Mr. Allen was in the apartment, there were no visible signs that Mr. Allen was present, and it was the middle of the day when a person might reasonably be away from home working or looking for a job, running errands, or visiting friends.

The Defendants rely on the fact that Detective Jones saw the porch blinds moving. If nonresponsive noise is not enough to give rise to a reasonable belief that a specific person is inside the home, as the Fourth Circuit held in *Hill*, it is difficult to see how the movement of blinds could be sufficient. Moreover, it was not early in the morning or late at night when a resident might be presumed to be home. *See Smith v. Tolley*, 960 F. Supp. 977, 988 (E.D. Va. 1997) (collecting cases); *cf. United States v. Felder*, 457 F. App'x 316, 321 (4th Cir. 2011) ("[I]t was reasonable for officers to believe, absent contrary evidence, that [defendant] was home at 7:00 a.m. . . . .").

Officers point to evidence that Mr. Allen was not employed and did not have a driver's license to support their suspicion that he was inside the apartment. (Doc. 91 at 16.) Unemployed people and people without driver's licenses are not homebound during the daytime, nor do they lose their constitutional right to be secure in their homes merely because they are not working or

16

do not drive.  There is no evidence that the police had any information as to Mr. Allen's habits.[6]

Indeed, the police themselves believed Mr. Allen was away from home the previous day and had

driven a car during the kidnapping.  This "status" evidence is insufficient by itself to give an

officer reason to believe a resident is at home at a particular time during a particular day.

A "reason to believe" is more than a suspicion and more than a hunch.  Even viewing the

evidence in the light most favorable to the Defendants, the officers did not have a reasonable

belief that Mr. Allen was present in the apartment.

### 2.  Qualified Immunity

Because officers entered Ms. Jones's apartment without a warrant, without exigent

circumstances, and without a reasonable belief that Mr. Allen was present at the time of entry,

they violated Ms. Jones's Fourth Amendment rights to be free from unreasonable searches or

seizures.  This conclusion, however, does not end the inquiry because the officers assert a claim

to qualified immunity.

As noted *supra*, "[q]ualified immunity is applicable unless the official's conduct violated

a *clearly established* constitutional right."  *Pearson*, 555 U.S. at 232 (emphasis added).

Qualified immunity is meant to protect against liability for "bad guesses in gray areas."

*Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).  Law enforcement officers who make

warrantless searches may assert qualified immunity.  *Anderson v. Creighton*, 483 U.S. 635, 638

(1987); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  The circumstances are viewed

---

[6]  *See United States v. Woods*, 560 F.2d 660, 665 (5th Cir. 1977) (holding that it is reasonable to
believe a suspect would be "at his place of abode, especially at 8:30 in the morning for a man not
known to be working"); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995) (holding that
officer's conduct was reasonable when suspect was unemployed and known to sleep late);
*Valdez*, 172 F.3d at 1227-1228 (upholding entry at noon when officers were aware the suspect
stayed out late at night drinking and had committed several nighttime robberies).

objectively, and the issue is whether the officer acted in an objectively reasonable manner. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Anderson*, 483 U.S. at 639.

### a. Exigent Circumstances

No reasonable officer would have believed that exigent circumstances existed in this case, even viewing the evidence in the light most favorable to the Defendants. Indeed, the established case law is to the contrary. *See Welsh*, 466 U.S. at 749-53; *Gould v. Davis*, 165 F.3d 265, 270-72 (4th Cir. 1998). While neither side has cited a case exactly on point, that does not help the Defendants. Officer-safety-exigent-circumstances cases typically involve specific threats of violence, *see, e.g., Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008) (suspect's 911 call threatening to kill co-workers justified emergency search of suspect's bags), the known presence of firearms or weapons, *see, e.g., United States v. Reed,* 935 F.2d 641 (4th Cir. 1991), or the need to identify and control persons present at a crime scene. *See, e.g., Maryland v. Buie,* 494 U.S. 325, 334 (1990). None of those circumstances, or any other specific circumstances of danger, exist here.

In *Maryland v. Buie*, the Supreme Court held that after executing an arrest warrant in the suspect's home, it is appropriate under the Fourth Amendment to search for others only in "spaces immediately adjoining the place of arrest from which an attack could be immediately launched," and beyond that, "there must be articulable facts which . . . would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 334. Merely invoking the mantra of officer safety is not the same as stating "articulable facts," and it does not give cover to warrantless searches if there are no objective facts supporting the existence of real risks to the officers.

The Defendants have not cited a case finding exigent circumstances under facts similar to these in even the most general way. "The absence of a prior case directly on all fours here

18

speaks not to the unsettledness of the law, but to the brashness of the conduct." *Bellotte*, 629 F.3d at 424 (internal quotation marks omitted). Where "a man of reasonable intelligence would not have believed that exigent circumstances existed in this situation," qualified immunity is not appropriate. *See id.* (internal quotation marks omitted). As to exigent circumstances, this was not a bad guess in a gray area by the Defendants; it was a clear violation of well-established law.

### b. Entry to Arrest a Resident

The Court reaches a different conclusion as to qualified immunity under the "entry-to-arrest-a-resident-with-a-valid-arrest-warrant" theory. *United States v. Hill*, discussed *supra* pp. 13 – 16, was decided in 2011 after the conduct in this case had taken place. 649 F.3d at 262-264. While officers now know that multiple factors indicating a defendant's presence must exist to justify entry, the officers in this case did not have the benefit of the Fourth Circuit's decision in *Hill* at the time they acted. The Court concludes that the officers are entitled to qualified immunity because the law was not clearly established at the time of the conduct.

In addition, in this Circuit, the law is not clear as to whether the "reasonable-belief- that-the-suspect-is-within" test is evaluated by a probable cause standard or a less stringent standard. Some circuits have found that probable cause is the appropriate standard. *See United States v. Hardin*, 539 F.3d 404, 416 n.6 (6th Cir. 2008); *United States v. Gorman*, 314 F.3d 1105, 1114 (9th Cir. 2002). Other circuits apply a more relaxed standard. *See United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005); *Lauter*, 57 F.3d at 215. The Fourth Circuit has remained silent.

For the reasons stated *supra*, the facts of this case do not rise to the level of probable cause to believe Mr. Allen was in the apartment, and no reasonable officer could have concluded otherwise. If a lower standard is applied, however, the answer is less certain. Given Mr. Allen's lack of employment, his lack of transportation, and his lack of a driver's license, a reasonable

officer applying a more relaxed standard could have evaluated that situation differently, even in the absence of movement of the blinds.

The purpose of qualified immunity is to give officers "breathing room to make reasonable but mistaken judgments." *Ashcroft*, 131 S. Ct. at 2085. The police did not pursue Mr. Allen on a Friday afternoon by choice, but by necessity. They had reason to believe he had committed a violent crime, they had knowledge of his violent past, and they sought to detain him immediately to protect the public. Taking this into account along with the circumstantial evidence the officers had concerning Mr. Allen's lack of employment and transportation, the Court concludes that officers applying a more relaxed standard than probable cause could have reasonably believed that they could enter lawfully. Thus, the Defendants are entitled to the benefit of qualified immunity, and summary judgment is appropriate.

### III. CONCLUSION

The undisputed facts establish that Detective Gillenwater had a reasonable belief that there was probable cause to charge Mr. Allen. Even if there was an issue with probable cause, he would be shielded by qualified immunity. There is no evidence to support a claim of false arrest against any other Defendant. Therefore, Defendants' motion for summary judgment on the claim for false arrest is **GRANTED** and Mr. Allen's motion for summary judgment on this claim is **DENIED.**

Similarly, Mr. Allen has failed to show any genuine issue of material fact as to the defamation claim because Chief Voorhees is protected by a qualified privilege to make good faith statements concerning the department's investigations. There is no evidence any other Defendant made a defamatory statement. Therefore, Defendants' motion for summary judgment as to the defamation claim is **GRANTED** and Mr. Allen's motion is **DENIED**.

Finally, while the evidence viewed in the light most favorable to the Defendants establishes that Detective Gillenwater and Officer Tunstall violated Ms. Jones's Fourth Amendment rights by searching her apartment without a warrant, the officers did not act in violation of a clearly established right in the particular circumstances of this case. Because a reasonable officer could have believed that entry into the apartment to serve an arrest warrant was lawful, Detective Gillenwater and Officer Tunstall are entitled to the benefit of qualified immunity. There is no evidence any other Defendant entered Ms. Jones's apartment. Summary judgment for the Defendants is **GRANTED** and summary judgment for Ms. Jones is **DENIED**.

**IT IS SO ORDERED.**

This the 15th day of August, 2012.

_____
UNITED STATES DISTRICT JUDGE